Harron, J., dissenting: It is my understanding that this case is of importance as a test ease, to test the meaning of the words used in (i) of section 403 (a) (5) (B), with respect to the fees paid to petitioner under'his contract with Raymond De-Icer Co. The question is whether petitioner’s contract of May 15, 1943, with Raymond DeIcer Co. was a “subcontract” within the meaning of (i) of section 403 (a) (5) (B). If petitioner .had agreed in the Raymond contract to solicit or attempt to procure a .contract with a Department, or subcontracts, it would be a subcontract under (ii) of section 403 (a) (5) (B); or if any amount payable to petitioner under the Raymond contract had been contingent upon the procurement of a contract with a Department, or subcontract, the Raymond contract would be a subcontract under (i) of section 403 (a) (5) (B). The terms of the Raymond contract did not embrace either of the above factors. However, Raymond had certain contracts or subcontracts with a Department or Departments, and the agreement with petitioner provided that his fees would be determined with reference to such Department contracts. That is the purport of the provision in the second paragraph of the agreement, and it is found as a fact that $17,467.07, represented 4½ per cent on the sales price received by Raymond on certain of its contracts (meaning contracts with Departments). It is the view of the majority that (i) in section 403 (a) (5) (B) is limited to an arrangement under which one party is to receive as compensation for his services, an amount determined with reference to the amount of a contract with a Department which he procures. That construction of the pertinent part of section 403 (a) (5) (B) was made first in Wolff v. Macauley, 8 T. C. 146, which was not reviewed by the Court. If the Congress intended that (i) should be limited to arrangements with agents where the agent procured a contract with a Department for his principal, there would seem to have been little reason for (ii) in section 403 (a) (5) (B). That clause becomes a tautological clause, unnecessarily repeating part of what would be covered by (i), if the view of the majority is correct. Searching the record to learn the intent of the legislators, I find significant statements of Mr. Yinson of Georgia in the Congressional Record for April 20,1943, at page 3687 (edition of the daily printing of the Record), where he speaks, not of the services of agents in procuring a contract, but of the payments to such agents, afterward, in servicing a contract with a Department. Part of his statement is set forth in the margin.[1] In the record of the hearings before the Committee on Naval Affairs (Senate), 78th Cong., 1st sess., on H. R. 1900, May 12,1943, Jacob E. Davis, Special Assistant to the Under Secretary of the Navy, stated • at page 17, as one of the objectives in dealing with the problem of fees of brokers and agents, as follows: * * * First, to prevent tbe unwarranted expense to the Navy caused by the inclusion of these exorbitant fees in the selling price of the contracts to which they were referable; * * * [Italics supplied.] I am of the opinion that (i) in (B) of section 403 (a) (5) is clear in its wording, although awkward, and that it provides that the term “subcontract” shall include an arrangement whereunder the compensation payable is determined with reference to the amount of a contract with a Department, or of a subcontract, regardless of whether the payee, a representative of the principal, did or did not 'procure the contract with the Department to which the fee is referable. This construction of (i) finds support, in my opinion, in the explanation given in Report 353 of the Committee on Naval Affairs of the House, 78th Cong., 1st sess., at page 6, which is quoted in the Wolff case, supra, notwithstanding the opposite view thereof which was taken in the Wolff case. I believe (i) is broad in its terms, and that the Congress was attempting to reach, for renegotiation, all fees paid to agents of principals which would, enter into the costs to he paid by the Government under contracts with principals who paid fees to agents; and that, in order to reach all fees of agents which, in the last analysis, the Government would be paying, as part of the cost of a war contract, the legislators worded (i) to include fees which would be referable to a war contract whether or not the agent procured the contract to which the fee is referred. The record of the legislators’ considerations shows that they were concerned about fees for “servicing” contracts which the agent did not procure. Since the view adopted by the majority serves to narrow the scope of (i) in a way which I believe was not intended, I respectfully dissent. Turner and Opper, JJ., agree with this dissent. Mr. Vinson of Georgia. * * * What selling is necessary in such a situation as this? Agent after agent who appeared before the committee admitted that little, if any, selling is required in these days. This is particularly true on repeat orders. Once a company has demonstrated its ability to produce, order after order keeps coming in, until even its expanded capacity is taxed, and there is a huge backlog which it will take months and even years to complete. And it must be remembered that appended to all this are contingent fees, mounting, ever mounting, as the war program expands. I am not prepared to say that in peacetime, and even at the beginning of the emergency, some of these representatives may not have served a useful function. They may have helped bring together Government and business, by persuading manufacturers that they could make something needed in the war program, and convincing Government officials to give them an opportunity to show what they could do. They may have made some suggestions for the adaptation of peacetime production to war requirements. Now that the war program has gotten under way, however, there is little left for them to do. They may help with priorities, they may expedite payments, they may generally service the contracts, but all this is certainly not worth anything like the huge sums they are receiving. Scarcely ever do they have a technical engineering background or experience. Hence they cannot perform engineering services. That is done by the engineers and designers in the services, and the engineering departments of the contractors. In short, they act as nothing more than intelligent conveyors of information between their principals and the Government departments.